UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | |
| | : | |
| **MIGUEL EUGENIO ZAPATA,** | : | Case No. 25-CR-131 (JDB) |
| also known as "**MICHAEL ZAPATA**," | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The government submits this memorandum in connection with the sentencing of Miguel Zapata scheduled for September 9, 2025. On May 29, 2025, Zapata pleaded guilty to one count of engaging in a scheme to falsify, conceal, and cover up material facts in violation of 18 U.S.C. § 1001(a)(1). The government does not take a position with respect to a particular sentence to be imposed, but respectfully submits that a sentence of incarceration, within the applicable Guidelines range of zero-to-six months' imprisonment, three years' supervised release, and a fine of $10,000 is appropriate and warranted.

Zapata intentionally submitted false tips to the Federal Bureau of Investigation claiming that at least seven of his former colleagues were involved in unlawful activities at the United States Capitol on January 6, 2021. He did so methodically, over the course of several days over a span of several months. He did so deliberately, taking the time to find public and nonpublic information about them before submitting his false tips. He gained no advantage by doing so and there is no apparent motive for his actions. But the consequences of his actions were clearly foreseeable: he made his former colleagues the subjects of federal law enforcement investigation, put their reputations and employment at risk, and diverted the resources of the FBI towards investigating these false allegations.

In light of the defendant's conduct and the lack of mitigating circumstances, the principles of sentencing set forth in 18 U.S.C. § 3553(a) call for a period of incarceration. Further, pursuant to the plea agreement, the government requests that the sentence imposed specify that during any period of probation or supervised release, the defendant shall refrain from seeking a security clearance and from applying for or accepting or continuing any employment with the U.S. Government, any state government, or any private employer that requires a security clearance during that same period. The government also requests that the sentence reflect that the defendant shall not contest suspension or debarment proceedings from current or future employment by the U.S. government, or employment pursuant to a contract held by himself or another with the U.S. government.

I.     **The Defendant's Criminal Conduct**

After the events at the United States Capitol on January 6, 2021, the FBI began an investigation and made a public appeal for tips related to unlawful activity at the U.S. Capitol on January 6, 2021. The FBI encouraged members of the public to submit tips via an online portal at tips.fbi.gov.[1] ECF No. 38 at 1.

When members of the public visited tips.fbi.gov to submit a tip, they were shown a warning banner that stated, in relevant part, "I understand that providing false information could subject me to fine, imprisonment, or both (Title 18, U.S. Code, Section 1001)." To progress past this warning to the tips page, the user was required to click "I Agree" to access the tip submission form. The warning banner shown below appeared every time an individual attempted to submit a tip at the publicly available tips.fbi.gov page:

---

[1] *See* https://www.fbi.gov/contact-us/field-offices/washingtondc/news/press-releases/fbi-seeking-information-related-to-violent-activity-at-the-us-capitol-building-010621

2



*Id*. at 1-2.

Using this tip line, and despite the banner warning and affirmative need to click a button stating that he agreed to the Section 1001 warning, Zapata purposefully submitted at least seven false tips to the FBI tip line anonymously on February 10, February 16, February 17, and April 11, 2021. *Id.* at 2.

The FBI investigated each tip—expending resources in assessing whether the individuals identified in the tips had committed any crimes—as it did the voluminous number of tips that were provided to it in the days, weeks, and months following the events of January 6, 2021.[2] But here, because of similarities in the wording of the tips, the grouping of the dates on which the tips were submitted, and the technical tradecraft used to submit them, the FBI eventually determined that

---

[2] FBI Director Christopher Wray testified in June 2021 that the FBI had received more than 200,000 digital media tips and more than 30,000 tips through its National Threat Operations Center relating to the events at the U.S. Capitol on January 6, 2021. *See* https://www.fbi.gov/news/speeches-and-testimony/examining-the-january-6-attack-on-the-us-capitol-wray-061521.

these tips appeared to be submitted by the same individual. *Id.* at 2. They all also originated from four specific, identified IP addresses that were assigned to a particular provider (hereinafter, "Company A"). Company A provided a service that allowed its users to access the Internet via an isolated web browser to help protect users from security threats and for other purposes. In general, when a user of Company A's services accessed a website through Company A's product, the website recorded an IP address associated with Company A, and not the end user. *Id.* at 3.

Each false tip submitted by Zapata was a striking allegation against a former colleague, made all the worse by their stated connections to the intelligence community, because each tip alleged that the identified government employees and contractors were involved in planning or participating in unlawful activities at the United States Capitol on January 6, 2021. *Id.* at 4-11. But none of the named government employees and contractors were even in Washington D.C. at the time of the events at the Capitol on January 6, 2021—a fact that the FBI had to investigate to determine. *Id.* at 4. The details of the tips and the extensive information provided, and the fact that the defendant's actions occurred over the course of several months, shows that this was neither a one-off bad act nor an act of impulsivity.

As part of his guilty plea, Zapata acknowledged the allegations he made in these "tips" were false, that he had no reason to believe any of the victims participated in the conduct he alleged, and that he submitted the "tips" in an effort to harass the victims. *Id.* at 11. Below are relevant portions of the seven false tips the defendant submitted to the FBI from February through April 2021.

  1. **February 10, 2021 – Victim 1 and Victim 2**

On February 10, 2021, Zapata submitted the following tip to the FBI about Victim 1:

> *[Victim 1] . . . was actively engaged in attempting to overthrow the government of the United States. [He/she] actively took part in the riot on January 6 2021, that lead to the deaths of 6 people.*
> ***Additional Info:*** *Has espoused [...] conspiracy theories and actively retaliates against colleagues that do not share [his/her] political views.*
> ***What was the exact crime that occurred?*** *Involvement in the Capitol riot and insurrection.*
> ***When did the crime/incident occur?*** *January 6 2021*
> ***Where did the crime/incident occur?*** *Washington, DC*

This tip listed Victim 2 as a witness and contained the following additional information in the witness information section of the tip form:

> *Additional Info: [T]ook part in the Capitol riot and insurrection alongside [Victim 1].*

Also on February 10, 2021, the defendant reported the following tip to the FBI about Victim 2:

> *[Victim 2] . . . was actively engaged in attempting to overthrow the government of the United States. [He/she] actively took part in the riot and insurrection on January 6 2021, that lead to the deaths of 6 people.*
> ***Additional Info:*** *Has espoused [...] conspiracy theories and aligns with colleagues that share similar views.*
> ***What was the exact crime that occurred?****: Actively took part in the riot and insurrection at the Capitol.*
> ***When did the crime/incident occur?*** *January 6 2021*
> ***Where did the crime/incident occur?*** *Washington, DC*

This tip listed Victim 1 as a witness.

The defendant also included additional details about Victim 1 and Victim 2, including their full names, ages, parts of their addresses, current employers, and security clearance levels.

From around March 2020 until early 2021, the defendant worked at the same workplace with both Victim 1 and Victim 2.

Company A's logs in February 2021 indicate that the defendant visited a section of Victim 1's and Victim 2's employer's website related to reporting activity of concern by employees. On

5

or around February 1, 2021, the employer received an anonymous report regarding Victim 1. According to both the employer and Victim 1, the employer received an anonymous report that Victim 1 had taken part in the unlawful activities at the Capitol and bragged about Victim 1's actions to colleagues. The employer's investigators contacted the anonymous reporter through their online reporting portal, and the reporter responded with additional details including an allegation that Victim 2 also attended the events at the Capitol. *Id*. 4-6.

### 2. February 16, 2021 – Victim 3 and Victim 5

i. <u>Victim 3</u>

On February 16, 2021, Zapata submitted the following tip to the FBI about Victim 3:

> *[Victim 3] attended the US capitol riot and insurrection and was present when storming the capitol.*
> ***What was the exact crime that occurred?:*** *Took part in insurrection at the US capitol*
> ***When did the crime/incident occur?*** *January 6 2021*
> ***Where did the crime/incident occur?*** *US Capitol*
> ***How is Contact Known:*** *Colleague*

The defendant also included additional details about Victim 3, including their full name, age, address, current employer, and security clearance level. The address provided in the tip is a virtual office address publicly available on the internet, and no one works at that location. Victim 3's name, job title, and description are also all available on the company's website.

In and around 2014 and 2015, the defendant and Victim 3 worked together.

ii. <u>Victim 5[3]</u>

Also on February 16, 2021, Zapata reported the following tip to the FBI about Victim 5:

> *[Victim 5] attended the US Capitol riot and insurrection. [He/she] took an active role in leading the riot and storming the US Captiol [sic] to hunt for politicians and execute them.*

---

[3] The designation "Victim 4" is purposefully omitted.

> ***Additional Info:*** *In addition to attending the riot and insurrection at the US Captiol,[sic] [he/she] espouses extremist ideology in the work place and has bragged about [his/her] association with the Boogaloo Bois, ProudBoys and Oath Keepers. While serving as a contractor at [an intelligence agency], [he/she] has accessed classified Agency resources to foment terror and incite violence by sharing this information with other conspiracy theory based personalities [...] [He/she] has often talked about "sharing classified information with these groups and individuals as being a [sic] [his/her] duty to ensure the United States Constitution is protected."*
> ***What was the exact crime that occurred?:*** *[Victim 5] attended the US Capitol riot and insurrection*
> ***When did the crime/incident occur?*** *January 6 2021*
> ***Where did the crime/incident occur?*** *US Capitol*
> ***How is Contact Known:*** *Colleague*

The defendant also included additional details about Victim 5, including their full name, age, current employer, previous employment, and security clearance level.

From approximately 2017 to 2019, the defendant worked with Victim 5. *Id.* 6-7.

### 3.  February 17, 2021 – Victim 6

On February 17, 2021, Zapata submitted the following tip to the FBI about Victim 6:

> *[Victim 6] attended the capitol riot insurrection. [He/she] was directly involved in coordination of the riot that lead [sic] to the deaths of 6 people.*
> ***Additional Info:*** *[...] [he/she] uses [his/her] clearance to continue supporting [an intelligence agency] and accesses classified information.*
> ***What was the exact crime that occurred?:*** *[Victim 6] attended the capitol riot insurrection.*
> ***When did the crime/incident occur?*** *January 6 2021*
> ***Where did the crime/incident occur?*** *Washington DC*
> ***How is Contact Known:*** *Colleague*

The defendant also included additional details about Victim 6, including their full name and nickname, age, current employer, previous employment, security clearance level, and an active hyperlink to Victim 6's LinkedIn page.

7

In or around 2015 through 2017, the defendant previously worked with Victim 6, who had interviewed and hired the defendant and then served as the defendant's program manager.

Company A's logs indicate that on or around February 17, 2021, the defendant conducted a Google search for Victim 6, viewed Victim 6's LinkedIn profile that the defendant included in his false tip, and viewed a profile for Victim 6 on a website that provides contact and profile information from across the internet—all in the approximately 40 minutes immediately prior to submitting the tip on Victim 6. *Id.* 7-8.

### 4. April 11, 2021 – Victim 7 and Victim 8

i. <u>Victim 7</u>

On April 11, 2021, Zapata submitted the following tip to the FBI about Victim 7:

> *[Victim 7] attended the riot insurrection at the Capitol that lead [sic] to the death of multiple people and the wounding of multiple police officers. [He/she] also provided support to domestic terrorist groups like the OathKeepers, Proud Boys and Boogaloos. [He/she] used [his/her] position of trust in the intelligence community to share classified information with these groups in an effort to assist them succeed [sic] in overthrowing the government. [He/she] currently works for [an intelligence agency][...] and is actively engaged in leadership meetings that grant [him/her] higher than normally expected access to classified information. [His/her] actions on January 6 directly lead [sic] to and actively contributed to the successful breach of Capitol police barricades through [his/her] encrypted communication techniques used on that day.*
> **What was the exact crime that occurred?:** *Attended and provided support to the January 6 insurrection riot*
> **When did the crime/incident occur?** *January 6 2021*
> **Where did the crime/incident occur?** *Washington DC, Capitol*
> **How is Contact Known:** *Colleague*

The defendant also included additional details about Victim 7, including their full name and nickname, age, part of their address, phone number, and current employer.

In approximately 2020, the defendant previously worked with Victim 7.

8

Company A's logs for April 11, 2021, indicate that ZAPATA conducted a Google search for Victim 7, viewed a LinkedIn profile for Victim 7, and viewed a Facebook profile for Victim 7 shortly before submitting the tip on Victim 7. *Id*. 8-9.

ii.  <u>Victim 8</u>

Also on April 11, 2021, Zapata submitted the following tip to the FBI about Victim 8:

> *[Victim 8] provided material support and coordination by way of [his/her] position of trust with access to classified information to domestic terrorist groups like the Proud Boys, Oathkeepers, and Boogaloos. [...] [he/she] shared classified information with terrorist groups in hopes that this information would lead to the overthrow of the United States government. [His/her] position of trust within the intelligence community led to these groups breaching police barricades by encouraging a flanking maneuver on the barricade that resulted in the overrun of police lines on January 6 2021. [...] [he/she] has maintained access to classified data, senior executive service employees and managers with connections to [an intelligence agency] and grown a social network of classified personnel from which [he/she] has exploited to support insurrection. For over a decade [he/she] has quietly plotted a "change in government" leading to the downfall of United States government and other institutions through [his/her] legacy position of trust and access.*
> ***What was the exact crime that occurred?:*** *January 6 insurrection riot at the Capitol*
> ***When did the crime/incident occur?*** *January 6 2021*
> ***Where did the crime/incident occur?*** *Capitol, Washington DC*
> ***How is Contact Known:*** *Colleague*

The defendant also included additional details about Victim 8, including their full name, age, home phone number, cell phone number, and current employer and a related website hyperlink.

From approximately December 2019 to February 2020, the defendant worked with Victim 8.

The defendant's tip included information that Victim 8 would have only provided to coworkers. Specifically, the phone number the defendant listed as Victim 8's home phone number

9

is actually Victim 8's spouse's number. Victim 8 reported that Victim 8 only uses that number as a contact number at work, and coworkers would have received a call card with the colleagues' phone numbers to take home.

Company A's logs on April 11, 2021, indicate that Zapata conducted a Google search for Victim 8, viewed a profile for Victim 8 on a website providing a directory of business contacts (the same hyperlink he included in his false tip), and viewed a LinkedIn profile for Victim 8 just minutes prior to submitting the tip on Victim 8. *Id.* 9-11.

## II.   The Applicable Sentencing Guidelines

To determine an appropriate sentence, the Court must first accurately calculate the defendant's advisory United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") range. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Given that the crime of conviction was 18 U.S.C. § 1001, the parties and the United States Probation Officer agree that the starting point for the Guidelines calculation is U.S.S.G. § 2B1.1. Section § 2B1.1 has a base offense level of 6 unless certain inapplicable provisions are met.

Further, the parties and the United States Probation Officer agree U.S.S.G. § 2B1.1(b)(10)(C) applies because the offense involved "sophisticated means" (specifically, the anonymization service provided by Company A). In this case, U.S.S.G. § 2B1.1(b)(10)(C) increases the offense level to 12. The parties agreed in the plea agreement that a two-level adjustment for use of a special skill pursuant to U.S.S.G. § 3B1.3 applies if § 2B1.1(b)(1)(C) does not apply.

According to U.S.S.G. § 2B1.1(b)(10)(C), comment. n. 9(B), "sophisticated means" is defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense, pertaining to the execution or concealment of an offense." The comment gives examples of sophisticated means, including "in a telemarketing scheme, locating

the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C), comment. n. 9(B). But many circuits have noted "that the enhancement properly applies to conduct less sophisticated than the list articulated in the application note." *United States v. Jennings*, 711 F.3d 1144, 1146-47 (9th Cir. 2013) (collecting cases). "Conduct need not involve highly complex schemes or exhibit exceptional brilliance to justify a sophisticated means enhancement." *Id*. at 1145. And the routing of internet traffic through other IP addresses to obfuscate the sender has been held to be a "sophisticated means" under U.S.S.G. § 2B1.1(b)(10)(C) before. *See United States v. Collick*, 611 F. App'x 553, 558 (11th Cir. 2015) (holding that the defendants' "use of prepaid debit cards, other people's mailing addresses, and other computer IP addresses constituted 'sophisticated means' in furtherance of the tax fraud conspiracy."). But the "sophisticated means" must be more than what is required to commit the crime. *See, e.g.*, *United States v. Montano*, 250 F.3d 709, 715 (9th Cir. 2001) (finding that because smuggling necessarily involves concealment, sophisticated means requires more than what is necessary to commit the crime).

      Here, Zapata committed a Section 1001(a) violation merely by submitting the false tips to the FBI. But by concealing and covering up his actions through the use of Company A's anonymization service, he engaged in "sophisticated means" in committing the offense. And it was a noteworthy step in and of itself; on some level, Zapata appreciated that what he was doing was wrong and did not want to be discovered engaging in his actions. Why else would he utilize a service that explicitly obscures one's IP address, which he, with his expertise in cybersecurity (*see*

11

PSR at ¶ 95) undoubtedly knew was the principal way that his identity as the tipster could be discovered?

The Guidelines state that if a defendant used a special skill, he can be subject to a 2-level increase, but that this does not apply if the skill is included in the base offense level or specific offense characteristic. *See, e.g.,* U.S.S.G. § 3B1.3. Thus, if the defendant's use of Company A's service to anonymize his conduct was a "sophisticated means," then it cannot be double counted as a "special skill." However, if the Court disagrees with parties and the United States Probation Officer about the application of U.S.S.G. § 2B1.1(b)(10)(C), the parties agree that a two-level increase is appropriate under U.S.S.G. § 3B1.3 because the defendant utilized a "special skill." That special skill was Zapata's extensive knowledge of cybersecurity, demonstrated through his use of the technical services of Company A, in perpetrating his crimes. Comment 4 to U.S.S.G. § 3B1.3 defines "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." The defendant himself reported working in various cybersecurity positions since 2020 (PSR ¶ 96), which is consistent with the cybersecurity doctoral program in which he is currently enrolled. (PSR ¶ 92).

For these reasons, the parties and the United States Probation Officer agree on the following Sentencing Guidelines Calculation:

| | | |
|---|---|---|
| U.S.S.G. § 2B1.1(a)(2) | Base Offense Level | 6 |
| U.S.S.G. § 2B1.1(b)(10)(C) | Specific Offense Characteristic-increase to level | 12 |
| | Total | 12 |
| | Acceptance of Responsibility, U.S.S.G. § 3E1.1(a) | -2 |
| | Zero Point Offender | -2 |

Adjusted Offense Level                                                                  =   8

At Offense Level 8, given his Criminal History Category of I, the defendant faces a Sentencing Guidelines-compliant sentence of zero-to-six months' imprisonment (probation eligible), and a fine of $2,000 to $20,000.[4]

**III.   The Appropriate Sentence Considering the Section 3553(a) Factors**

To determine an appropriate sentence, after the Court accurately calculates the defendant's advisory Guidelines range, it should consider the various factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. 38 at 49-50 (2007). These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a) As discussed below, the United States submits that considering these factors, a carceral sentence is appropriate.

**A.   The Nature and Circumstances of the Offense Strongly Support the Recommended Guidelines-Compliant Sentence of Incarceration**

The nature and circumstances of the offense support a carceral sentence. The defendant lied to the FBI and put at risk the reputations and livelihoods of at least seven people—people he knew and with whom he had worked—while diverting FBI Special Agents from other important law enforcement priorities in order to investigate his false tips.

The defendant's actions were not casual. As the records from Company A show, after logging in to that service he would, for some victims, conduct LinkedIn, Google, and/or Facebook searches about them (Victims 6, 7, and 8). For another, he consulted records he possessed for years (a telephone number given as an emergency contact when he was colleagues with the victim) (Victim 8). For another, he submitted a false tip to the victim's employer (Victim 1).

---

[4] The fine range was erroneously listed in the plea paperwork as $1,000 to $10,000.

Taking these steps—methodical, time-consuming steps—over the course of four days in February and April 2021 shows the defendant's level of premeditation.

And then there is the content of the false tips themselves and its effect on the victims. To tell the FBI that a person attended a "riot" or an "insurrection" and shared classified information with "conspiracy based personalities" while that person was working for an intelligence agency and held a security clearance is, simply put, malicious. The clear intent of making such allegations was to jeopardize someone's liberty (through law enforcement action had the tips not been determined to be false—each victim had to present evidence to the FBI that he or she had not, in fact, participated in illegal events on January 6) and/or employment (because such allegations are incompatible with work for an intelligence agency or with possession of a security clearance). The defendant had to know the natural and expected consequences of his actions on how his former colleagues' lives would be turned upside down due to investigations by the FBI into his false reports, and the potential consequences of those investigations for those affiliated with intelligence agencies whose employment may be conditioned on the ability to hold a security clearance.

In addition, the defendant's actions degraded the usefulness and sanctity of the FBI Tip Line—a tool that should be preserved at all costs, given its presence at the front line of solving crimes. People who corrupt that tool should be punished, and those who think about doing so should be warned that sentences will include jail time.

Finally, there is the matter of the effect of submitting these false tips on the FBI. Every moment that FBI Special Agents wasted investigating the defendant's false allegations against these innocent victims was a moment not spent investigating other tips relating to illegal activity on January 6 or elsewhere on the myriad matters of public importance entrusted to federal law enforcement agents. This diversion of resources was readily predictable by the defendant. He

14

committed these criminal actions regardless, and in doing so attempted to use our nation's justice system for his own nefarious objectives.

In sum, the malicious and disruptive nature of the defendant's actions, the wide-ranging circumstances and consequences of his crime, and the need to provide effective deterrence for those who would consider abusing the FBI Tip Line and our entire law enforcement system for their own purposes, all militate strongly in favor of a sentence of incarceration.

> **B.   The History and Characteristics of the Defendant Support a Significant Sentence**

While the defendant disclaims any memory of where he worked prior to some of his most recent employment (PSR at ¶ 98), as he admitted in the Statement of Offense, he previously worked in federal government service and worked with all seven of the government employees or contractors named in the false tips. Further, he is an educated professional who clearly had the wherewithal to appreciate the wrongness of his conduct and the natural consequences of his actions.

Because of the defendant's background as a former government contractor coupled with the specific criminal actions he committed, he is unsuited for the trust and confidence of a security clearance by the United States government and subject to debarment from future federal employment or contracts. For these reasons, the defendant agreed through the plea agreement that he will "not oppose, as a condition of any period of probation or supervised release, that he refrain from seeking a security clearance for the duration of any period of supervised release ordered by the Court and from applying for or accepting or continuing any employment with the U.S. Government, any state government, or any private employer that requires a security clearance during that same period." ECF 37 at 2. Further, he agreed to "waive[] his right to contest suspension or debarment proceedings from current or future employment by the U.S. government, or

15

employment pursuant to a contract held by himself or another with the U.S. government, based on the conduct outlined in the Statement of Offense, all of which he admit[ed] is true." *Id*. The government respectfully requests that the Court include these special provisions in the judgment in this matter.

### C. The Need to Avoid Unwarranted Sentencing Disparities

The starting point in the Court's analysis under § 3553(a)(6) should be to consider the sentences of "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Several cases support the proposition that a carceral sentence is appropriate.

In September 2018, George Papadopoulos was sentenced to 14 days incarceration, one year of supervised release, a fine of $9,500, and 200 hours of community service for his violation of Section 1001 in connection with providing material false statements and omissions to the FBI in the course of the Special Counsel's investigation into the Russian government's efforts to interfere in the 2016 presidential election. *See United States v. Papadopoulos*, 17-cr-182 (RDM), 2018 WL 6173444, at *1 (D.D.C. Nov. 25, 2018). The U.S.S.G. base offense level agreed to in Papadopoulos's plea agreement was 6, and no enhancements under the Sentencing Guidelines were applied. *United States v. Papadopoulos*, 17-cr-182 (RDM), ECF 18. The fine of $9,500 was the top of the Guidelines range for the applicable offense level. *Id*. at ECF 44 at 10. In its memorandum in aid of sentencing, the government did not specifically recommend a sentence for the defendant but argued that a carceral sentence within the zero-to-six-month range was appropriate. *Id*.

Similarly, Alex van der Zwaan pleaded guilty to violating 18 U.S.C. § 1001(a) for lying to the FBI. *See United States v. van der Zwaan*, 18-cr-31 (ABJ) (April 3, 2018). In his case, van der Zwaan appeared at the Special Counsel's Office for an interview and lied regarding topics at the center of a significant investigation into the criminal conduct of Paul J. Manafort, Jr., and Richard W. Gates III. *United States v. van der Zwaan*, 18-cr-31 (ABJ) (ECF 19 (government's sentencing

16

memorandum)). van der Zwaan was sentenced to thirty days' incarceration and two months of supervised release. *United States v. van der Zwaan*, 18-cr-31 (ABJ) (D.D.C. April 3, 2018).

In *United States v. Barressi*, the defendant called the FBI and implicated the manager of a store where his girlfriend worked in the September 11 terrorist attacks. *United States v. Barressi*, 316 F.3d 69, 71 (2d Cir. 2002). The FBI called Barressi three days later and he repeated the false tip during that conversation. *Id.* The following week, an FBI agent interviewed Barressi at his home. *Id.* He initially repeated the false accusation but later recanted in the same interview and admitted to the falsity of his statement. *Id.* Barressi was charged with violating § 1001(a)(2) and later pleaded guilty. *Id.* At sentencing on January 2, 2002, the district court applied a base level of 6 under U.S.S.G. § 2B1.1 (Nov. 1, 2001) and then deducted 2 levels for acceptance of responsibility pursuant to § 3E1.1(a). The resulting level 4, combined with Barressi's criminal history category III, would have resulted in a zero-to-six-month range. The district court, however, exercised its discretion to depart upward. It added an additional 8 levels, and sentenced Barressi to 21 months, the top of the resulting Guidelines range. *Id*. On appeal, the Second Circuit reversed, holding that the district court was also not permitted to take the defendant's prior record into account in determining the extent of a vertical upward departure. *Id*. at 75. Following a remand, on June 3, 2003, the defendant was resentenced to time served.

In *United States v. Never Misses A Shot*, 715 F.3d 1048 (8th Cir. 2013), the defendant pleaded guilty to making false statements in violation of 18 U.S.C. § 1001(a)(2). Never Misses A Shot made false statements to FBI agents regarding a federal investigation into the disappearance of A.J. Lufkins. *Id*. at 1050. Never Misses A Shot called an FBI agent and stated that two individuals came to his house and confessed to assaulting and killing Lufkins, then burning and disposing of the body. *Id*. Never Misses A Shot's fictitious story involved specific details about

17

beating Lufkins and discarding his remains in the Missouri River. *Id*. None of these statements were true, and Never Misses A Shot later admitted that he had lied to the FBI in an attempt to divert attention from another person the FBI had recently interviewed in connection with Lufkins' disappearance. *Id*. At sentencing, the court departed upward from the advisory guidelines range, which was two-to-eight months' incarceration, and sentenced Never Misses A Shot to 36 months' imprisonment. *Id*. The sentence was affirmed on appeal. *Id*.

As occurred in *Papdopoulos* and *van der Zwann,* here Zapata too told material lies to agents in the course of an investigation and deserves a carceral sentence. The *Barressi* and *Never Misses A Shot* cases further demonstrate that periods of incarceration are appropriate for vindictive lies made to federal law enforcement for ones' own purposes—precisely the defendant's actions in the instant case.

Though the applicable Guidelines would permit a probationary sentence, such a sentence would be inappropriate because "[p]robationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class," *United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008); *accord United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006). There should be no doubt for anyone that lying to the FBI—especially as a means of retribution or harassment—will face severe consequences.

IV.     **Fine, Forfeiture, and Restitution**

Consistent with the Sentencing Guidelines, the government asks the Court to impose a fine of $10,000.

The Mandatory Victims Restitution Act ("MVRA") requires sentencing courts to order restitution for certain crimes, such as "an offense against property under this title ... including any offense committed by fraud or deceit," and where an identifiable victim has suffered pecuniary loss. 18 U.S.C. § 3663A(a)(1); § 3663A(c)(1). "The purpose of the MVRA, then, is 'essentially

18

compensatory: to restore a victim, to the extent money can do so, to the position [the victim] occupied before sustaining injury.'" *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012) (quoting *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006)). "Its authorization is accordingly limited to the actual, provable loss suffered by the victim and caused by the offense conduct." *Id*. Losses under the MVRA cannot be "speculative." *See United States v. Serawop*, 505 F.3d 1112, 1123 (10th Cir. 2007).

The statute defines "victim" broadly as any:

> person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2).

Here, one victim told to the FBI that he/she had an estimated $8,000 in direct financial loss from time spent responding to the defendant's allegations, but acknowledged that it was a subjective figure, and indirect financial loss in the form of reputational harm to his/her company. However, this victim also reported to the FBI that he/she was "not concerned with restitution in general." In his/her victim impact statement, this victim provided an estimated value of lost opportunities but emphasized that this was subjective based upon lost opportunities due to organizations being concerned over the allegations and his/her integrity. Under these circumstances, the government does not propose that the Court order restitution.

## **CONCLUSION**

For the reasons set forth above, the government respectfully submits that a sentence of incarceration, within the applicable Guidelines range of zero-to-six months' imprisonment, three years' supervised release, and a $10,000 fine are warranted and appropriate. The government

further requests that the judgment in this case specify that, during any period of probation or supervised release, the defendant shall refrain from seeking a security clearance and from applying for or accepting or continuing any employment with the U.S. Government, any state government, or any private employer that requires a security clearance during that same period. The government also requests that the sentence reflect that the defendant shall not contest suspension or debarment proceedings from current or future employment by the U.S. government, or employment pursuant to a contract held by himself or another with the U.S. government.

                                                Respectfully submitted,

                                                JEANINE FERRIS PIRRO
                                                United States Attorney

Dated: September 4, 2025        By:    */s/ Stuart Allen*
                                                STUART D. ALLEN
                                                D.C. Bar No. 1005102
                                                Assistant United States Attorney
                                                National Security Section
                                                U.S. Attorney's Office for the District of Columbia
                                                601 D Street, NW
                                                Washington, D.C. 20530
                                                (202) 252-7794
                                                stuart.allen@usdoj.gov